**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:08-cr-00283-RCJ-RJJ |
| vs. | ) | |
| | ) | |
| STEVEN BOOTH et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

I.      **INTRODUCTION**

On October 28, 2008, a federal grand jury returned an Indictment charging Defendants with having engaged in a RICO enterprise, the "Playboy Bloods" street gang.  Defendants Stephen Booth, Jacorey Taylor, Reginald Dunlap, and Marquette Tillman (collectively, "Defendants") have also been charged with committing a violent crime, murder, in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(1) and (a)(2).  Those four Defendants await trial, and the Attorney General has declined to pursue the death penalty against them.  The other six Defendants have pled guilty to various charges, and any remaining charges against them have been dismissed.  Pending before the Court are six motions by Tillman.

II.     **DISCUSSION**

A.      **Motion for Discovery (ECF No. 588)**

This motion is a twenty-eight page list of discovery requests, with two exhibits attached

thereto.  The list is prodigious and contains mostly non-discoverable items.  First, Exhibits A and B consist of lists of witnesses whose statements Defendant desires, but whose statements are not due to Defendant unless and until those witnesses have testified at trial. *See* Fed. R. Crim. P. 16(2) (citing 18 U.S.C. § 3500).  Second, the Government is aware of its responsibilities under *Brady v. Maryland* as a general matter, and Defendant provides no factual support for why any particular piece of information yet withheld must be disclosed under that line of cases.  Third, as to other requests in the motion, which is extremely broad, the Court denies those requests, *see* Fed. R. Crim. P. 16(a)(2), except in the following instances, to the extent the Government has not yet complied: (1) oral statements by Defendants[1] in response to interrogation by a person Defendants knew were Government agents, if the Government intends to use those statements at trial, *see* Fed. R. Crim. P. 16(a)(1)(A);[2] (2) physical and mental examinations and scientific tests within the Government's control that the Government intends to use in its case-in-chief, or which is material to preparing the defense, *see* Fed. R. Crim. P. 16(a)(1)(F);[3] and (3) any documents or objects material to preparing the defense, that the Government intends to use in its case-in-chief, or that were taken from or belong to Tillman, *see* Fed. R. Crim. P. 16(a)(1)(E)(1)–(3).[4]

---

[1]The other remaining Defendants have joined the present motion, but each Defendant is only entitled to disclosure of his own statements.  Whether Defendants share the information is up to them.

[2]Tillman specifies a voluntary statement he made to LVMPD officers under LVMPD Event #020512-1882 and any statements he made during telephone calls from jail and prison after January 27, 2004.

[3]Tillman specifies any tests conducted on a telephone seized from him and any tests relating to fingerprints found on a vehicle associated with the attempted murder charge.

[4]Tillman specifies his telephone records, audio recordings of all recorded witness statements, an audio recording of a telephonic search warrant application on January 21, 2004, a search warrant return for a search at 911 Weaver Dr. on June 21, 2007, photographs taken before or after searches and arrests of Tillman, statements of certain witnesses concerning the murder of Brandon Crosby and the attempted murder of witnesses (these statements are not due under the Jencks Act until such witnesses have testified), 911 calls and dispatch records, local police

**B.    Motion to Suppress (ECF No. 592)**

Tillman asks the Court to suppress evidence of police interviews with him, certain of his telephone conversations, and a statement he gave on January 20, 2004.  However, Tillman admits he currently does not have sufficient support for his motion.  He therefore presents the present motion as a "premature . . . bare-bones" attempt.

First, Tillman asks the Court to exclude statements he made during two interrogations on January 21, 2004.  Tillman argues that he was not Mirandized during the first recorded interrogation that began at 6:58 p.m., though there is a reference to a previous interrogation where he was Mirandized and waived his rights.  The transcript of the recorded interrogation is Exhibit A to the present motion.  Detective Wilson begins the interview by indicating it is a voluntary statement, and on page five he recounts with Tillman that he has been read his rights, has signed a rights advisement card, and has agreed to waive his rights.  The Government adduces the *Miranda* rights advisement card signed by Tillman at 4:04 p.m. on that date. (*See* ECF No. 684-1).  The Court will therefore not suppress the statements made during the Exhibit A interview, nor will it suppress the Exhibit B or C interviews based upon *Miranda*.

There are two transcripts of the second interview provided.  Exhibits B and C appear to represent two incomplete transcripts of the second interview, with partial overlap.  The Exhibit C interview begins at 9:25 p.m. on January 21, 2004 and concludes at 10:15 p.m. according to pages 1 and 58 of the Exhibit C, respectively.  Exhibit C consists of the entire transcript of the official "voluntary statement" from 9:25 to 10:15 p.m, and nothing more.  Exhibit B is a transcript covering only the first part of the "voluntary statement," as well as some additional interrogation immediately preceding it.  Page 96 of the Exhibit B transcript and page 1 of the Exhibit C transcript both begin with Detective Long announcing that he is beginning a voluntary

reports (which are protected from disclosure under Criminal Rule 16(a)(2), *see United States v. Fort*, 472 F.3d 1106, 1119–20 (9th Cir. 2007)), Co-defendants' statements (discoverable by stipulation), information in gang database files, etc.

1    statement of Tillman at 9:25 p.m. on January 21, 2004.  In other words, pages 1–95 of Exhibit B

2    represent the transcript of some period of interrogation, probably beginning at approximately

3    8:00 p.m. (as estimated based upon the 96 pages of transcript before Detective Long announces it

4    is 9:25 p.m.), followed by part of the official "voluntary statement" beginning at 9:25 p.m.  In

5    summary, Exhibits A, B, and C together appear to represent partially overlapping fragments of a

6    single interview from 6:58 p.m. (The beginning of the Exhibit A transcript) to 10:15 p.m. (the

7    end of the Exhibit C transcript), with a break at 7:50 p.m (the end of the Exhibit A transcript)

8    until approximately 8:00 p.m. (the estimated beginning of the Exhibit B transcript).

9          An approximately three-hour interview is not enough to implicate the Fourteenth

10    Amendment's prohibition against involuntary statements without more.  However, on pages

11    43–44, 55–57, 89, and 95 of the Exhibit B transcript, Tillman indicates he is having trouble

12    breathing, yet the interrogation continues without medical attention.  On pages 43–44 of Exhibit

13    B, Tillman states that he "can't breathe," "need[s his] machine," "need[s] a treatment," and

14    "need[s a] medical ambulance."  The interrogator indicates that "they" will get Tillman a nurse,

15    but the interrogation continues with no treatment.  On pages 55–57, Tillman indicates he "can't

16    breathe" and that he needs a psychiatrist because of the stress of the interrogation.  On page 89,

17    he again indicates that he can't breathe and needs "treatment."  Finally, on page 95, he indicates

18    that he had been sitting in the chair "all day," that his back hurt, he couldn't breathe, and that he

19    needed another "treatment."

20          "An inculpatory statement is voluntary only when it is the product of a rational intellect

21    and a free will.  The test is whether, considering the totality of the circumstances, the

22    government obtained the statement by physical or psychological coercion or by improper

23    inducement so that the suspect's will was overborne." *United States v. Guerrero*, 847 F.2d 1363,

24    1365–66 (9th Cir. 1988) (citations omitted).  Here, there is no indication that Tillman made any

25    statements in order to obtain treatment or to stop the questioning.  There do not appear to have

been any promises or offers of relief if he answered questions in any particular way, and in fact

he appears never to make the admission the interrogator was attempting to obtain, i.e., that he

committed or participated in the shooting.  The Court will not suppress these statements at this

time.

Second, Tillman asks the Court to exclude any statements he made wherein he allegedly

admitted his gang membership.  Tillman notes that he broadly refers to thirty-eight interviews

over a seven-year period.  He does not, however, identify any particular statement or the

circumstances surrounding it, so the Court cannot perform a Fifth Amendment analysis at this

time.

Third, Tillman asks the Court to exclude any statements Tillman made in telephone calls

from jail.  Again, Tillman does not identify any particular statements or telephone calls.  He

notes that a prisoner's reasonable expectation to privacy in telephone calls is waived only if the

prisoner is given notice before the call that it may be monitored.  He then argues that although

prison telephone systems typically announce such a warning automatically when the recipient of

a call from the inmate answers the call, it is not clear whether the inmate himself can necessarily

hear the warning.  Again, Tillman does not allege the circumstances surrounding any particular

calls he made, and he therefore identifies no particular evidence for the Court to consider

excluding.  Tillman notes that the Government has not revealed to him which calls it intends to

use at trial.  But this is no excuse for failing to identify particular evidence.  If Tillman is aware

of a particular call that he believes should be excluded, he must identify the call and explain why

the circumstances of the call warrant exclusion under the Fourth Amendment.

### C.    Motion to Suppress (ECF No. 593)

Tillman asks the Court to suppress evidence discovered during the search of his residence

at Apt. 149, 3650 E. Lake Mead  on January 21, 2004.  Again, Tillman admits the motion is

premature.  The warrant was issued pursuant to a telephonic application, a copy of which is

1   adduced as Exhibit A to the present motion. (*See* ECF No. 593-1).  Tillman argues that he is

2   entitled to an evidentiary hearing on the validity of the affidavit because it contained

3   intentionally or recklessly false statements or misleading omissions and that it cannot have

4   supported a finding of probable cause without the allegedly false information. *See United States*

5   *v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).  Specifically, he alleges: (1) identifications of

6   Tillman as being responsible for the Crosby homicide were "suspect"; (2) it is false that two eye-

7   witnesses identified Tillman as the person who committed an attempted murder; (3) it was false

8   that Tillman was seen running from the Wilcox homicide with a gun; (4) it was deceptive that

9   Tillman threatened to kill Boyd and Wilcox minutes before Wilcox was shot; and (5) it was false

10  that Wilcox made a spontaneous remark during his January 21, 2004 arrest that "Just because I

11  was there doesn't mean I killed anybody."

12      In the affidavit, Sgt. Rocky Alby testified telephonically that on January 14, 2004, he was

13  called to the scene of the apparent homicide of Brandeon Crosby in a 1999 Pontic Grand Prix

14  near 1701 N. J Street in Las Vegas.  The following day, an autopsy concluded that the cause of

15  death was multiple gunshot wounds.  Also on January 15, the attempted homicide of two persons

16  was reported at the same address.  During the investigation of the Crosby homicide, a witness,

17  Pleshette Jefferson identified Tillman as having waited for Crosby with a gun, held her hostage

18  there until he returned, walked towards the car where he was standing, and then shot him.  Her

19  description of Tillman's clothing was consistent with that of other witnesses.  Witnesses Ricky

20  Plaier and Georgia Crosby, who were the alleged targets of the attempted murder, testified that

21  four to five shots were fired at them from a car in which they saw Tillman and others.  Georgia

22  Crosby was Brandeon Crosby's sister.  On January 20, 2004, security guards Brian Wilcox and

23  Gordon Boyd had approached Tillman, who was wearing a grey hooded sweatshirt, because he

24  had been trespassed from the property.  Tillman spit on Boyd and threatened to kill him.  Boyd

25  proceeded to ride away on a bicycle but then heard several gunshots and heard Wilcox cry out in

pain.  An unnamed witness saw a man in a grey hooded sweatshirt running away with a gun in his right hand.  Forty-five caliber casings were found at the scene of these events.  On January 21, 2004, Tillman was seen leaving Apartment 149 at 3650 E. Lake Mead at the Sand Lake Apartments.  When detained, he admitted living in Apartment 149 and stated spontaneously, "Just because I was there doesn't mean I killed anyone."  A judge found probable cause to believe a crime was committed, that Tillman committed it, and that evidence may be found in the Apartment.  He issued a warrant for the apartment and surrounding areas for: indicia of ownership and control, a .45 caliber handgun, .45 caliber ammunition, certain clothing, and a cell phone.

        Defendant makes no showing to undermine this warrant application.  He provides the declaration of Attorney Grele.  Grele notes that Jefferson described Crosby's killer as "about 5'7'," but that Tillman is 6'0 to 6'2".  He also notes that the convicted killer of Crosby, Kijani Owens, is 5'5".  Grele notes that Jefferson identified Tillman in a line-up on January 21, 2004. Grele notes that he has not been provided with Jefferson's taped statement.  He also notes that Jefferson later testified that she was heavily medicated during these interviews, and that LVMPD knew this.  As to the attempted murders, Grele claims that neither Plair nor Georgia Crosby identified Tillman as being in the car from which somebody tried to shoot them.  He claims that LVMPD obtained no statement at all from Plair before the search, so it cannot have relied on anything Plair told them.  Grele also claims that Crockett never identified Tillman, and in fact said she did not identify Tillman when shown his photo along with five others, stating that she only remembered seeing the gun.

        As to the Wilcox homicide, Grele claims that the person running from Wilcox in a grey hooded sweatshirt and carrying a gun was identified by witness Ashley Washington as being a person who got into an argument with her cousin earlier in the evening.  The physical description she gave of that person (slim, 130–140 pounds, about 5'7", about 18 years old) does not match

1    Tillman, who was 170 pounds, 6'0" to 6'2", and 23 years old).

2           The Court finds there was sufficient probable cause based on the witness testimony of

3    Boyd and Washington.  Washington's description is fair for an eighteen year old.  The difference

4    between 140 and 170 pounds is not great on a man's frame, and a 23-year-old can appear to be

5    18.  Boyd's observations, however, were sufficient by themselves to provide probable cause that

6    Tillman killed Wilcox.  He witnessed a death threat and then heard the gunshots that killed his

7    partner shortly thereafter.  Grele claims that Boyd actually heard Tillman tell him to leave

8    "before you die," and that death threats were commonplace in the neighborhood.  This may

9    create reasonable doubt in a juror's mind, but the facts as known to Sgt. Alby and related to the

10   judge, even discounting all witnesses except Boyd, were sufficient to support probable cause to

11   search Tillman's apartment for evidence of the Wilcox murder.  The Court need not examine

12   whether there was probable cause to believe that Tillman was involved in the other incidents,

13   because the affidavit supported the warrant even with all the information relating to the other

14   incidents removed.

15          Finally, Defendants argue that a transcript of an interview with Tillman's girlfriend

16   indicates that officers had been inside Tillman's and her apartment before applying for the search

17   warrant.  But the officer's statement during the interview (which appears to have occurred before

18   the warrant application) that he had noticed some keys on the refrigerator could indicate that he

19   had been in the apartment with Tillman's girlfriend's permission in order to conduct the

20   interview, or that he had noticed the keys from a window while walking past.  But even

21   assuming—and there is weak evidence to suggest it—that officers searched the Tillman

22   residence before obtaining a search warrant, the evidence obtained pursuant to the eventual

23   warrant are simply not fruits of such a putative violation, because the issuance of the warrant

24   was not based even in part upon evidence obtained during such a putative illegal search.

25   Although such a search would be illegal and actionable under 42 U.S.C. § 1983 absent an

1   exception to the warrant requirement, it would not require the suppression of evidence obtained

2   during the subsequent search if the warrant authorizing the subsequent search was obtained

3   based upon information not traceable to the illegal search.

4       **D.      Motion for a Bill of Particulars (ECF No. 594)**

5       "A bill of particulars is appropriate when the indictment is insufficient to permit the

6   preparation of an adequate defense." *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir.

7   1985) (citing Fed. R. Crim. P. 7(f)). "In determining if a bill of particulars should be ordered in

8   a specific case, a court should consider whether the defendant has been advised adequately of the

9   charges through the indictment and all other disclosures made by the government." *United States*

10  *v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (citing *United States v. Giese*, 597 F.2d 1170, 1180

11  (9th Cir.), *cert. denied*, 444 U.S. 979 (1979)). "The decision whether to grant a request for a bill

12  of particulars is directed to the trial court's discretion." *Id.* (citing *Will v. United States*, 389 U.S.

13  90, 99 (1967); *Wong Tai v. United States*, 273 U.S. 77, 82 (1927)).

14      The Court denies the motion. The Indictment is sufficient to apprise Tillman of the

15  charges against him. The Indictment is in fact so detailed that Tillman previously asked the

16  Court to strike surplusage therefrom. Furthermore, at the hearing on the motion to strike

17  surplusage, the parties agreed that the Government would file a superseding information or

18  indictment. The Superseding Indictment, (*see* ECF No. 650), sufficiently apprises Tillman of the

19  charges against him.

20      **E.      Motion for Release of Grand Jury Transcripts (ECF No. 595)**

21      "The court may authorize disclosure--at a time, in a manner, and subject to any other

22  conditions that it directs--of a grand-jury matter . . . at the request of a defendant who shows that

23  a ground may exist to dismiss the indictment because of a matter that occurred before the grand

24  jury." Fed. R. Crim. P. 6(e)(3)(E) and (E)(ii). "A party seeking disclosure of the grand jury

25  transcripts must demonstrate a 'particularized need' for the disclosure." *United States v. Perez*,

1   67 F.3d 1371, 1381 (9th Cir. 1995) (citing *Dennis v. United States*, 384 U.S. 855, 870 (1966);

2   *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986)).  "The standards the trial court

3   should apply in granting disclosure of the grand jury transcripts are '(1) that the desired material

4   will avoid a possible injustice, (2) that the need for disclosure is greater than the need for

5   continued secrecy, and (3) that only the relevant parts of the transcripts should be disclosed.." *Id.*

6   (quoting *United States v. Plummer*, 941 F.2d 799, 806 (9th Cir. 1991) (citing *Douglas Oil Co. v.*

7   *Petrol Stops Nw.*, 441 U.S. 211, 222 (1979))).  A speculative claim does not meet the

8   particularized-need standard. *Id.* (citing *Walcza*k, 783 F.2d at 857).  There must be some

9   evidence adduced supporting the request for disclosure, i.e., some evidence that something

10  occurred in the grand jury proceedings that would support a motion to dismiss the indictment.

11  *See id.*

12          Here, Tillman argues that the Indictment "suggest[s] the grand jury was improperly

13  instructed as to counts one, two, and three."  This is the kind of speculation that will not support

14  the release of grand jury transcripts.  However, Tillman argues alternatively that he does not

15  desire transcripts, but only a copy of the instructions given to the grand jury by the Government,

16  which he argues have traditionally been subject to disclosure.

17          Another district court within this Circuit has ruled that grand jury "instructions do not fall

18  within the bar of Rule 6(e) because their disclosure would not reveal the substance or essence of

19  the grand jury proceedings." *United States v. Diaz*, 236 F.R.D. 470, 477–78 (N.D. Cal. 2006).

20  The Ninth Circuit has suggested in dicta that a defendant is entitled to see the instructions to the

21  grand jury. *See United States v. Alter*, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("Alter was

22  entitled to know the content of the court's charges to the grand jury.  The proceedings before the

23  grand jury are secret, but the ground rules by which the grand jury conducts those proceedings

24  are not.").  The Court will therefore grant the motion, ordering only the release of the

25  instructions to the grand jury, including any colloquy explaining the instructions, with any

1    identifying information of jurors redacted.

2        **F.    Motion for Ex Parte Subpoenas (ECF No. 597)**

3        Tillman requests the ex parte issuance of a subpoena duces tecum under Criminal Rule

4    17(c)(1) directing a witness from Sprint to bring with him or her to trial the telephone records of

5    Tillman and Kijani Owens between December 1, 2003 and February 9, 2004.  The Court grants

6    the motion.

7                        **CONCLUSION**

8        IT IS HEREBY ORDERED that the Motion for Discovery (ECF No. 588) and Joinders

9    (ECF Nos. 591, 617, 619, 621) thereto are GRANTED in part and DENIED in part.

10       IT IS FURTHER ORDERED that the Motions to Suppress (ECF Nos. 592, 593) are

11   DENIED.

12       IT IS FURTHER ORDERED that the Motion for a Bill of Particulars (ECF No. 594) is

13   DENIED.

14       IT IS FURTHER ORDERED that the Motion for Release of Grand Jury Transcripts

15   (ECF No. 595) is GRANTED.  The Government shall disclose the instructions to the grand jury

16   as to the elements of the charges, including any colloquy explaining the instructions, but with

17   any identifying information of jurors redacted.

18       IT IS FURTHER ORDERED that the Motion for Ex Parte Subpoenas (ECF No. 597) is

19   GRANTED.

20       IT IS SO ORDERED.

21   DATED: This 9th July, 2012.

22

23                         ROBERT C. JONES

                     United States District Judge

24

25